UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHARLENE S. BARKER,<br><br>     Petitioner,<br><br> v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br>Administration,<br><br>    Respondent. | Case No. 4:15-cv-00257-CWD<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

**INTRODUCTION**

Before the Court is Charlene Barker's Petition for Review, filed on July 10, 2015. (Dkt. 1.) The Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and the administrative record (AR). For the reasons that follow, the Court will remand the decision of the Commissioner.

**PROCEDURAL AND FACTUAL HISTORY**

Petitioner filed an application for Disability Insurance Benefits and Supplemental Security Income on April 30, 2013, claiming disability beginning April 30, 2013. Petitioner alleges significant impairments, which include major depressive disorder; bipolar disorder; degenerative disk disease of the cervical and lumbar spine, status post

**MEMORANDUM DECISION AND ORDER - 1**

L4-5 fusion; Factor V deficiency; seizure disorder; deep vein thrombosis of the right lower extremity; obesity; and obstructive sleep apnea. This application was denied initially and on reconsideration, and a hearing was held on March 23, 2015, before Administrative Law Judge (ALJ) Luke Brennan.  After hearing testimony from Petitioner and vocational expert Kourtney Layton, ALJ Brennan issued a decision on April 2, 2015, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied her request for review on May 19, 2015.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was 49 years of age. Petitioner graduated from high school and completed a certificate program in esthetics. Petitioner's prior work experience includes work as a medical assistant and receptionist.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's major depressive disorder; bipolar disorder; degenerative disk disease of the cervical and lumbar spine, status post L4-5 fusion; Factor V deficiency; seizure disorder; deep vein thrombosis of the right lower extremity;

obesity; and obstructive sleep apnea severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically considering Listing 1.04 (Disorders of the spine); Listing 3.10 (Sleep related breathing disorders); Listing 11.02  (Epilepsy – convulsive epilepsy (grand mal or psychomotor)) and Listing 11.03 (Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal)); Listing 7.08 (chronic thrombocytopenia); and Listings 12.04, 12.06, and 12.08 (Affective disorder, anxiety-related disorder, and personality disorder).

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. The ALJ determined Petitioner retained the RFC to perform light work, with additional limitations. Those limitations included the following restrictions: lift and carry 20 pounds occasionally and 10 pounds frequently; frequently climb ramps and stairs; never climb ladders and scaffolds; frequently stoop, kneel, crouch, and balance; occasionally crawl; avoid concentrated exposure to hazards such as extreme heat and cold; avoid moderate exposure to vibration; avoid all exposure to hazards including unprotected heights and moving machinery; and limited to simple, routine tasks, with occasional interaction with supervisors, co-workers, and the public.

With such an RFC, the ALJ found Petitioner was not able to perform her past

**MEMORANDUM DECISION AND ORDER - 3**

relevant work as either a receptionist or medical assistant. If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience. Given Petitioner's RFC and the hypothetical posed to the vocational expert, the ALJ found Petitioner would be able to perform the requirements of representative occupations such as marker; mail clerk; and routing clerk. Accordingly, the ALJ found Petitioner not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if

**MEMORANDUM DECISION AND ORDER - 4**

the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the Petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's

credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner contends the ALJ erred at steps three and four. Specifically, Petitioner argues the ALJ erred when he found Petitioner did not meet either Listing 11.02 (Epilepsy) or Listing 12.07 (Somatoform mental disorder). Petitioner argues also the ALJ erred in his credibility assessment and improperly discounted the opinions of Petitioner's treating physician, Dr. Stephen Denagy, and other treating sources.  Each assignment of error will be discussed in turn.

## 1.    Meet or Equal a Listing

The ALJ found Petitioner's impairments did not meet or equal any listing. At issue here are Listings 11.02 (Epilepsy) and 12.07 (Somatoform disorders). Petitioner claims her seizures, which are classified as psychogenic non-epileptic seizures (PNES), are medically equivalent to epileptic seizures, or alternatively would meet the definition of a somatoform disorder.

If the claimant satisfies the criteria under a listing and meets the twelve month duration requirement, the Commissioner must find the claimant disabled without

**MEMORANDUM DECISION AND ORDER - 6**

considering age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(iii), (d). A claimant bears the burden of producing medical evidence establishing all of the requisite medical findings that her impairments meet or equal any particular listing. *Bowen v. Yuckert,* 482 U.S 137, 146, n. 5 (1987). Further, if the claimant is alleging equivalency to a listing, the claimant must proffer a theory, plausible or other, as to how her combined impairments equal a listing. *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001).

Equivalence is determined on the basis of a comparison between the "symptoms, signs and laboratory findings" about the claimant's impairment as evidenced by the medical records "with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526. Further, equivalence depends on medical evidence only; age, education, and work experience are irrelevant. *Id.* at § 404.1526(c). Finally and critically, "the claimant's illnesses 'must be considered in combination and must not be fragmentized in evaluating their effects.'" *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995) (quoting *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985)). "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment. *Lewis*, 236 F.3d at 512 (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)).

The ALJ concluded Petitioner "does not have any medically acceptable objective diagnostic evidence of a seizure disorder (see below)." (AR 24.) To support his conclusion, the ALJ relied upon Petitioner's normal EEG results, obtained in October of 2011, and in February of 2012. In addition, the ALJ found the record was "not consistent

**MEMORANDUM DECISION AND ORDER - 7**

with the claimant's allegations of disabling seizures" because Petitioner has not been observed to have any bruising or other indicia of having suffered injuries due to the seizures, despite Petitioner's allegations that the seizures last at least half an hour, are highly convulsive, and happen every day.

The ALJ further found that, despite Petitioner's allegations of suffering postictal symptoms of convulsion that last several hours and sometimes up to a day or two, "one would expect Petitioner to be in a confused stupor most of the time. Yet she is almost never observed to exhibit confusion, word finding difficulties, or other indicia of such postictal symptoms." The ALJ next proceeded to discount Petitioner's description that her seizures lessened in duration, but not frequency, on the grounds that Petitioner's physician remarked in July of 2014 that, whereas she used to observe the Petitioner having seizures, "it had been a long time since she had observed such a seizure." (AR 28.) The ALJ drew the conclusion that, because Petitioner's physician had not witnessed a seizure recently, the seizures decreased in frequency, contrary to Petitioner's allegations that they had not.

Petitioner contends the ALJ erred, because Petitioner's seizure disorder is not detected by, or diagnosed with, an EEG. Further, Petitioner notes the ALJ witnessed the occurrence of a seizure during the hearing, yet failed to mention it in his written decision. Petitioner contends the ALJ erred by manufacturing his own conclusions regarding Petitioner's seizure disorder that are not supported by evidence in the record. The Court finds Petitioner is correct.

**MEMORANDUM DECISION AND ORDER - 8**

Epilepsy is a listed impairment evaluated according to the type, frequency, duration, and after-effect of seizures. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). To meet Listing 11.02, a claimant must document by detailed description a typical seizure pattern, including all associated phenomena, which occurs more frequently than once a month in spite of at least three months of prescribed treatment. The seizures must present as either daytime episodes (loss of consciousness and convulsive seizures) or nocturnal episodes manifesting residuals which interfere significantly with activity during the day.[1]

Respondent argues substantial evidence supports the ALJ's finding that Petitioner did not have medically acceptable objective diagnostic evidence of a seizure disorder because Petitioner failed to present the requisite objective evidence of a detailed description of a typical seizure. On the contrary—Petitioner presented several detailed descriptions of a typical seizure in her brief, with references to the record where medical providers documented their own personal observations. (Dkt. 13 at 7-8.)

For example, Petitioner cited to a January 27, 2012 emergency department report, where the medical provider noted: "Pt in active seizure when EMS arrived. Pt arrived moaning and having seizure like activity upon arrival in to ED." (AR 303.) Medical providers noted Petitioner was shaking upon arrival, had an altered mental status, and had

---

[1] 11.02 Epilepsy - convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:
  A. Daytime episodes (loss of consciousness and convulsive seizures) or
  B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

**MEMORANDUM DECISION AND ORDER - 9**

intermittent shaking, which could be stopped abruptly with painful stimuli. (AR 303-305.) The initial evaluation indicated it "was clear that the patient was having pseudoseizures." (AR 306.)

Petitioner cited to her evaluation at Swedish Medical Center, where Petitioner underwent EEG monitoring from February 13, 2012, to February 17, 2012, for a total of four full days of continuous monitoring. (Dkt. 13 at 8; AR 314-317.) During observation, although no electrical abnormalities were seen via an EEG, Petitioner was described as exhibiting minimal sleep and observed as having numerous clinical events, the first of which consisted of hyperventilation, shoulder shaking, shoulder twitching, backwards head arching, stiffness, and upper body jerks in a waxing and waning fashion. A second event was described as rapid shoulder and head shaking, moaning, increased movement intensity, repetitive tension with small arching and brief periods of arching of the upper back and neck, with corresponding unresponsiveness to verbal stimulation. Additional, similar seizure-like events were observed throughout the four days of testing and observation. *Id.*

The third seizure description Petitioner cited was the event documented by Pearl Health Clinic on October 8, 2013. (Dkt. 13 at 9; AR 404.) In the treatment note, Nurse Practitioner Elizabeth Bentley documented that, two hours into the assessment process, Petitioner demonstrated acute anxiety, or a seizure, which lasted for 20-30 minutes, characterized by tightening muscles in her arms and hands, heavy breathing, and thrashing. (AR 404.) Bentley noted Petitioner was cognitively alert and able to

**MEMORANDUM DECISION AND ORDER - 10**

communicate, but that the episode did not fully dissipate and paramedics were contacted to transport Petitioner to the hospital. (AR 405.)

And finally, Petitioner pointed to the transcript of the hearing, wherein the ALJ admitted: "claimant is having a seizure." (Dkt. 13 at 9; AR 76.) Petitioner's sister, who attended the hearing, is recorded as instructing her sister to "take deep breaths," and giving her water. At its conclusion, the ALJ noted that "Ms. Barker had what has been— what appears to be and what has been described as a typical seizure for her." (AR 78.) Respondent's argument that Petitioner failed to give a detailed description of a typical seizure is therefore rejected, and the Court finds the ALJ erred.

Next, Respondent argues Petitioner waived the argument that her impairments are medically equivalent to Listing 11.02, because Petitioner did not provide supporting analysis for her medical equivalence argument. Again, the Court rejects Respondent's argument, finding Petitioner adequately explained in her brief why she functionally equals the requirements of Listing 11.02. Petitioner noted the medical records indicated that, in August of 2014, Petitioner reported having seizures 3-5 times a week, with an increase in daytime seizures, consistent with her report in September of 2014 at the Sleep Institute. (AR 530, 536.) Petitioner followed up consistently with her care providers regarding her seizure disorder, and was prescribed a variety of medications to treat her

**MEMORANDUM DECISION AND ORDER - 11**

disorder and her other ailments. (AR 533.)[2] Petitioner notes also that her medical records indicate her seizures were misdiagnosed, and she was treated for epilepsy. (AR 387; 457.)[3] Petitioner argued in her brief that her seizure disorder, as documented by the medical record, manifests itself in "frequent, psychogenic non-epileptiform seizure episodes" equivalent to epilepsy. Brief at 5-6. Petitioner therefore adequately provided supporting analysis for her medical equivalence argument.

Here, the ALJ improperly utilized his credibility analysis as support for finding Petitioner's seizure disorder did not meet, or was not medically equivalent to, a listed impairment. Petitioner's credibility, which concerns the disabling effects of her seizures, requires an entirely different analysis than determining whether Petitioner meets or equals a listing. When considering medical equivalence to epilepsy, the ALJ must evaluate the type, frequency, duration, and after-effect of Petitioner's seizures, which are well documented in the medical records. The ALJ made no specific findings as to the nature and extent of the seizures, and instead utilized his credibility analysis to substitute for such findings.

The ALJ's credibility analysis clearly demonstrates the ALJ simply did not believe

---

[2] The August 26, 2014 progress note from Quinn Thibodeau, LCPC, indicates Petitioner at that time was prescribed and taking Latuda 80 MG; Abilify 2 MG; Lorazepam 1 MG; Propranolol HCL 20 MG; Prazosin HCl 2 MG; Lamotrigine 200 MG; Zarelto 20 MG; Naltrexone HCl 4.5; Ropinirole HCl 2 2MG; and Praminpexole Dihydrochloride 1 MG on a daily basis.

[3] The treatment note from September 3, 2013, from the Pearl Health Clinic, documents Petitioner reported having multiple seizure episodes. Portneuf medical records dated October 28, 2013, indicate Petitioner previously was prescribed seizure medications.

**MEMORANDUM DECISION AND ORDER - 12**

Petitioner's account of her seizures,[4] and makes no mention of the detailed descriptions of Petitioner's psychogenic seizure activity observed and documented by Petitioner's medical care providers. Nor did the ALJ make any findings as to whether Petitioner suffered nighttime seizures that affected her daytime activity. Here, the ALJ's statement that Petitioner does not have objective diagnostic evidence of a seizure disorder, which next referred to his analysis of credibility, is not sufficient and constitutes error.

Additionally, the Court finds the ALJ's failure to consider Petitioner's seizure disorder under Listing 12.07 constitutes reversible error. Despite presenting with nonepileptic seizures, or psychogenic nonepileptic seizures (AR 457, 559), the ALJ did not compare Petitioner's impairments to Listing 12.07. (AR 24.) The Court is perplexed at the omission, given the definition of Listing 12.07 includes, as a symptom, "persistent nonorganic disturbance of ...movement and its control (e.g.,...psychogenic seizures....)."

The full text of Listing 12.07 states:

> Somatoform disorders manifest themselves in:
> Physical symptoms for which there are no demonstrable
> organic findings or known physiological mechanisms.
> The required level of severity for these disorders is met when
> the requirements in both A and B are satisfied.
> A. Medically documented by evidence of one of the

---

[4] The ALJ was of the opinion that Petitioner's report of having seizures every day would require her to "be in a confused stupor most of the time. Yet she is almost never observed to exhibit confusion, word finding difficulties, or other indicia of such postictal symptoms." (AR 28.) The ALJ does not cite to the record to support this "observation." However, the Court found several instances where medical care providers indicated Petitioner was suffering from impaired cognition and memory. (AR 539-- "she cannot remember from visit to visit what we discuss; her cognition is impaired, memory impaired." "her cognition is not intact."); (AR 540 – "has so much difficulty w/ memory she can't remember what we have gone through."); (AR 545 – suggesting patient "get all her meds from heartland and all in bubble packs instead of fredmyer (sic) and heartland, too confusing and she doesn't know what she does or doesn't take."). The ALJ erred by ignoring this evidence in favor of his own unsupported conclusion.

**MEMORANDUM DECISION AND ORDER - 13**

following:

    1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2. Persistent nonorganic disturbance of one of the following:

    a. Vision; or

    b. Speech; or

    c. Hearing; or

    d. Use of a limb; or

    e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia); or

    f. Sensation (e.g., diminished or heightened).

    3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND

    B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

Although the ALJ failed to discuss the paragraph B criteria in the context of Listing 12.07, he did so when considering whether Petitioner met the requirements of Listings 12.04, 12.06, and 12.08. The ALJ found Petitioner had mild restrictions of daily living, moderate difficulty with social functioning, and moderate difficulties with regard to concentration, persistence, and pace. (AR 24.) The ALJ then added additional analysis at step four. The ALJ gave little weight to the opinions of Petitioner's treating physician and her other care providers, all of whom opined Petitioner had marked limitations with respect to her mental functioning. The grounds for doing so were that, if the opinions

**MEMORANDUM DECISION AND ORDER - 14**

were true, "one would be surprised to see the clamaint ever leave her house." (AR 29-30.)

Respondent argues the ALJ's analysis satisfies the analysis that would have been required under Listing 12.07, because the ALJ adequately discussed the paragraph B criteria and properly discredited the medical opinions supporting a finding of marked limitations in at least two key functional areas. (Brief at 13, Dkt. 16.) However, Respondent's arguments that the ALJ properly discredited Dr. Denagy's and LCPC Thibodeau's opinions ring hollow, as they are nothing more than generalizations. The Court finds the ALJ erred when evaluating the treating physician's opinion and the other medical source opinions as they related to the part B criteria, discussed below.

## 2.    Physician Opinions and Other Medical Sources

The Ninth Circuit Court of Appeals distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). Also, "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Even if the treating doctor's opinion

is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And, like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The ALJ is required also to consider the opinions of "other sources," such as therapists or counselors. 20 C.F.R. § 404.1513(d). The ALJ may discount testimony from other sources if the ALJ "gives reasons germane to each witness for doing so." *Molina v. Astrue*, 674. F.3d 1104, 1111 (9th Cir. 2012).

Petitioner's treating physician, Dr. Denagy, was of the opinion that Petitioner had extreme limitations in maintaining social functioning and concentration, persistence, or pace, and marked restrictions of activities of daily living. (AR 522-525.) Petitioner's counselor, Quinn Thibodeau, LCPC, was essentially in agreement with Dr. Denagy. (AR 521, 526-529.) The ALJ rejected the opinions of Dr. Denagy and LCPC Thibodeau in

**MEMORANDUM DECISION AND ORDER - 16**

favor of the opinion of the state agency psychological consultant, on the grounds that the agency opinion was rendered after a review of the record and was consistent with the record as a whole. (AR 24.) The state agency consultants were of the opinion that Petitioner had, at most, moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace; and mild limitations in activities of daily living. (AR 90; 106; 126.)

Additionally, the ALJ gave the consultative psychological examiner, Jay Casper, Ed.D.'s opinion significant weight. Dr. Casper was of the opinion Petitioner would have problems with social interaction and sustaining concentration at work, but could perform simple tasks. The reasons given for assessing "great weight" to Dr. Casper's opinion were that his opinion was "generally consistent with the claimant's mental health treatment history, her mental status exam findings, and the record as a whole." (AR 30.)

Without any analysis, the ALJ adopted the report of the consulting psychological examiner and the reviewing state agency consultants on the grounds their opinions were consistent with Petitioner's mental status exam, physical exam findings, and her treatment history. The Court finds these assertions without support in the record. Upon close review, the ALJ's decision to reject the opinions of Dr. Denagy and LCPC Thibodeau is not supported by the record as a whole. The ALJ based his rejection of Dr. Denagy's and LCPC Thibodeau's opinions upon his own speculation and with generalized assertions that the record as a whole did not support their opinions.

With regard to the first reason for rejecting Dr. Denagy's opinion---that it is so

**MEMORANDUM DECISION AND ORDER - 17**

extreme Petitioner would not be expected to leave the house---substantial evidence in the record supports the conclusion that Petitioner does not leave the house unless someone (usually her sister) accompanies her. The third party function report completed by Petitioner's sister indicates she takes Petitioner shopping, to doctor's appointments, and to run errands. (AR 239.) Petitioner's sister indicates also that, other than doctor's appointments, Petitioner does not have any hobbies or places that she goes on a regular basis. (AR 243-244; 384.) Petitioner reported she does not like to leave the house, and does so only to go to her medical appointments. (AR 253, 383-384.) There is no evidence in the medical records that Petitioner reported going anywhere on a consistent basis or having any hobbies or interests outside her home.

Next, the ALJ cites inconsistency with Petitioner's mental status exam as a reason for discounting Dr. Denagy's opinion.  (AR 28-29; 30.) The mental status exam referenced is Dr. Casper's opinion, dated August 20, 2013. (AR 382-386.) The ALJ cannot discredit Dr. Denagy's opinion on the sole ground that it conflicts with the report of an examining physician. Rather, once a conflict is found, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence in the record for discrediting the treating physician's opinion. The mere existence of a conflict is not a specific or legitimate reason for discounting the opinions of a treating source.

Continuing with the physical exam findings, the ALJ cites to the same medical reports to indicate that, while the exams reveal instances of tearful and labile affect, poor hygiene, tangential thoughts, and depressed mood, they also reveal Petitioner to be

**MEMORANDUM DECISION AND ORDER - 18**

"pleasant and cooperative," with normal affect and thought processes, normal concentration, and a normal ability to relate to stories and jokes. (AR 28.) Perhaps the Court is reviewing different medical records from those the ALJ reviewed. Upon examination of the medical evidence the ALJ cited for support that Petitioner is frequently revealed to be relatively "normal," (AR 29), the Court finds no support for the ALJ's conclusion that the physical exam findings contradict Dr. Denagy's and LCPC Thibodeau's opinions.

For example, Exhibit 8F (AR 382)[5] cited by the ALJ, indicates Petitioner arrived to the examination with her hair "in complete disarray," exhibited changing facial expressions, and although her behavior was appropriate in that she was cooperative and pleasant, she was "quite dependent." (AR 382.) Exhibit 9F (AR 387, 402), documenting two different office visits on September 3, 2013, and October 8, 2013, indicate Petitioner reported seizure activity; was receiving cortisone injections for pain; and that she experienced hallucinations trying to pull a hydrant out of the ground. The remaining portions of those same medical records appear to be her medical history, documented in a consistent fashion as part of the electronic medical record. Exhibit 11F (AR 474, 478, 495) appears to list Petitioner's medications, chief complaint, past medical history, and surgical history, and contains no discussion of Petitioner's affect, appearance, or mood.

Exhibit 26F (AR 751, 752, 758, 763, 724, 770, 775, 780, 784, 789) consists of Dr. Denagy's treatment records spanning from January 31, 2014, through January 27, 2015.

---

[5] Exhibit 8F happens to be Dr. Casper's written report.

**MEMORANDUM DECISION AND ORDER - 19**

According to Dr. Denagy's observations over the course of the year, Petitioner's symptoms appeared to wax and wane, and did achieve some stability by January of 2015. In January of 2014, Petitioner presented with akathisia, and was on numerous psychotropic drugs for her condition. The mental status examination on March 4, 2014, revealed her to appear "sharper, and more active," and Dr. Denagy was working to wean Petitioner off several medications. At that time, Petitioner had no transportation, was fearful walking to the supermarket, and was afraid of having a seizure. Office visit notes from April 8, 2014, indicate weight gain from Lithium; tremor; and dystonia. Her anxiety was still "very profound." Office notes from May 2, 2014, indicate Petitioner complained of no motivation, increased seizure frequency, problems with insomnia, and she appeared upset.

On June 25, 2014, Petitioner reported worsening depression, anxiety with an increase in pain, the existence of an abnormal sleep study indicating cataplectic-like events, difficulty sleeping, severe anxiety, and pain. Dr. Denagy observed her to be anxious and restless, pacing, tangential without pressured speech or flight of ideas, and with mood-congruent thought, which was depressed. On July 22, 2014, Petitioner reported slurred speech and hallucinations at night. According to Dr. Denagy, the discontinuance of prazosin appears to have contributed to the increase in symptoms. Dr. Denagy recommended Petitioner obtain a service animal. He recorded Petitioner continued to have full symptom borderline traits and PTSD issues, which had increased; he noted also her speech was slurred, and that Petitioner appeared more depressed and

**MEMORANDUM DECISION AND ORDER - 20**

tended toward weepiness.

Dr. Denagy's remaining medical records continue in the same vein. By January 27, 2015, Dr. Denagy recorded Petitioner was "fairly stable," but continued to have mood instability and struggles with fundamental impairments between her sleep disorder and her seizure attacks. Dr. Denagy noted she continued to have phobia, anxiety, pain, and difficulty sleeping. Petitioner reported being homebound and having seizure attacks.

Finally, the ALJ relied on Exhibit 28F, which are LCPC Thibodeau's notes dated August 28, 2014, to February 19, 2015. (AR 812, 814, 818, 819, 822, 824, 826, 828.) Thibodeau consistently recorded that, during the counseling sessions, Petitioner had a pleasant affect, labile[6] mood, and continued physical pain. Thibodeau was treating Petitioner for depression, anxiety, fear, lack of coping skills, low motivation, episodes of tearfulness, and an inability to manage her own self-care. The fact Petitioner appeared "pleasant" does not somehow render her mood instability insignificant.

Other records cited by the ALJ are not treatment records pertaining to Petitioner's mental health treatment, and therefore do not contain a detailed description of Petitioner's mood. For example, Exhibit 20F and 27F (AR 563, 795), are Petitioner's sleep study records. Petitioner is reported as having appropriate affect, judgment, and insight on many of the records. But, these records are what documented Petitioner's seizure activity and sleep disturbances, and do not relate to her mood disorder. Also of note, however, are what is contained in the records. For example, on February 23, 2015, the technician noted

---

[6] Labile mood refers to a mood state in which a person experiences rapidly shifting and changing emotions. F.A. Davis, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (18th ed. 1997).

**MEMORANDUM DECISION AND ORDER - 21**

Petitioner was sleeping for 2 hours at a time, and noticing more pseudo seizures. (AR 795.) On September 5, 2014, another record cited by the AJL, the technician recorded Petitioner was so sleepy she was falling asleep during the visit. (AR 799.)

In other words, upon a close examination of the medical records cited by the ALJ to support his conclusion that the physical exam findings contradict Dr. Denagy's and LCPC Thibodeau's opinions, the Court has difficulty finding references supportive of a conclusion Petitioner exhibited normal affect, normal thought processes, normal appearance, normal concentration and speech, and a normal ability to relate to stories and jokes. In that same vein, the Court finds the ALJ's conclusory opinion that Petitioner's treatment history is inconsistent with Dr. Denagy's and LCPC Thibodeau's opinions to be in error. Rather, the treatment history indicates Petitioner sought extensive treatment from a counselor; her treating physician; a sleep study institute; a pain specialist; and several other providers on a regular basis over the course of three years.

On the record before the Court, the ALJ did not reasonably reject Dr. Denagy's or LCPC Thibodeau's opinions. Finding these errors significant, the Court declines to address whether the ALJ erred in his evaluation of P.A. Barbo's opinion, who rendered an opinion regarding Petitioner's physical limitations, and the evaluation of the examining physicians. (Resp. Brief at 9, Dkt. 16.) The ALJ will be required to review all of the opinions anew, given Dr. Denagy is a treating source physician, and LCPC Thibodeau is an "other treating source".

**MEMORANDUM DECISION AND ORDER - 22**

3.      **Credibility**

The last issue on appeal is the ALJ's credibility assessment. Petitioner argues the

ALJ erred and did not apply SSR 96-7p correctly. Respondent contends the ALJ properly

assessed Petitioner's credibility by providing specific, clear and convincing reasons

supported by substantial evidence in the record. The Court disagrees, and finds the ALJ

erred.

When assessing the credibility of a claimant's testimony regarding subjective pain

or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue*,

572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is

"'objective medical evidence of an underlying impairment which could reasonably be

expected to produce the pain or other symptoms alleged.'" *Id*. If the claimant has

presented such evidence, and there is no evidence of malingering, the ALJ must give

"'specific, clear and convincing reasons'" to reject the claimant's testimony about the

severity of the symptoms. *Id*. At the same time, the ALJ is not "required to believe every

allegation of disabling pain, or else disability benefits would be available for the asking, a

result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603

(9th Cir. 1989). In evaluating the claimant's testimony, the ALJ may use "'ordinary

techniques of credibility evaluation.'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

1224 n.3 (9th Cir. 2010).

For instance, the ALJ may consider inconsistencies either in the claimant's

testimony or between the testimony and the claimant's conduct, *id*.; "'unexplained or

**MEMORANDUM DECISION AND ORDER - 23**

inadequately explained failure to seek treatment or to follow a prescribed course of treatment,'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). While a claimant need not "'vegetate in a dark room'" in order to be eligible for benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225.

The ALJ engaged in none of these credibility assessment techniques, instead substituting his own judgment. The Court finds the reasons the ALJ gave for discrediting Petitioner's testimony about the severity of her symptoms do not rely upon inconsistent statements; failure to seek treatment; or her daily activities. Rather, the ALJ manufactured reasons unsupported by the record.

Beginning with Petitioner's seizures, the ALJ discounts Petitioner's allegations of disabling seizures, not based upon the medical evidence of record, but because she has not been observed to have any bruising or other indicia of having suffered injuries due to these seizures. (AR 28.) The descriptions of Petitioner's seizures as reported by medical care providers who actually observed them, however, indicate Petitioner's seizures

**MEMORANDUM DECISION AND ORDER - 24**

consist of limb movements, (AR 574), tightening muscles, heavy breathing, and thrashing (AR 404). In other words, they are not typical of a grand mal type seizure where one might expect injuries. And, no care provider who reported observing a seizure reported Petitioner as suffering injuries or bruising after experiencing a seizure. Accordingly, the lack of bruising is not a clear and convincing reason to discredit the disabling effects of Petitioner's seizures, especially where there is ample evidence in the record to indicate she suffers from psychogenic non-epileptiform seizure episodes.

The ALJ relied upon a note from Petitioner's physician that it had been a long time since she had observed a seizure for his finding that Petitioner's seizures had lessened in frequency, contrary to Petitioner's allegations. (AR 28.) The fact Petitioner's health care provider had not witnessed a seizure during an office visit is not a clear and convincing reason to discredit Petitioner. The observation simply indicates Petitioner had not had a seizure during one of her appointments. Nonetheless, Petitioner continued to report to all of her care providers that she suffered from seizures throughout every week. (*See* AR 530, office visit August 26, 2014, reporting 3-5 seizures a week; AR 536, office visit September 5, 2014, reporting seizures 3-5 times per week.)

Next, the ALJ discredits Petitioner on the ground that she is never observed to exhibit confusion, word finding difficulties, or other indicia of postictal symptoms despite having seizures every day. (AR 28.) Again, there is ample support in the record of Petitioner's memory problems, slurred speech, and other similar symptoms. As discussed previously, Petitioner had difficulty remembering what was discussed in appointments

**MEMORANDUM DECISION AND ORDER - 25**

(AR 539); could not remember her medication regimen (AR 545); and exhibited slurred speech during appointments with Dr. Denagy.

The ALJ discredits Petitioner's allegations of fatigue and sleeplessness on the ground she is generally not observed to appear fatigued. (AR 28.) However, the medical records indicate a severe sleep disorder. On October 27, 2013, the Sleep Institute indicated tests revealed minimal REM sleep, absent slow wave sleep, and severe periodic limb movement disorder and underlying hypoxia, or low oxygen saturation, all of which could be expected to produce fatigue and sleeplessness. (AR 447.) Records from the Sleep Institute on September 5, 2014, indicate Petitioner was falling asleep during the visit. (AR 536.) On December 11, 2013, Petitioner reported that, while Ambien helped her fall asleep and stay asleep, she would awake not feeling rested and was sleepy all day. (AR 513, 554.) Substantial medical evidence supports Petitioner's allegations, and the fact her medical care providers did not document whether Petitioner appeared drowsy during her medical visits[7] is not a clear and convincing reason for discrediting Petitioner's testimony.

The ALJ discredits Petitioner's allegations of severe problems walking and standing, indicative of pain, on the ground she does not use assistive devices to aid in ambulation. (AR 28.) However, no doctor has prescribed assistive devices to address Petitioner's pain, because her pain does not appear orthopedic in nature such that an assistive device would help. Rather, Petitioner sought treatment for her pain from the

---

[7] Nor do the EMR forms include a note for the care provider to document whether she appeared drowsy.

**MEMORANDUM DECISION AND ORDER - 26**

Pain and Spine Specialists of Idaho, who recommended trigger point injections to address Petitioner's complaint of arthralgia in her low back, neck, and feet. (AR 621.)

And last, the ALJ discredited Petitioner's testimony about the severity of her mental limitations because she has not sought emergency room treatment or psychiatric hospitalization. (AR 28.) The ALJ noted also that her treatment was conservative and her symptoms were controlled by medications and therapy. (AR 27-28.) The lack of emergency room treatment or hospitalization is not a specific and legitimate reason to discredit Petitioner's testimony. Such a reason does not relate to a failure to seek treatment, Petitioner's daily activities, or an inconsistency within the medical records themselves. And the Court finds the ALJ's characterization of the treatment history as conservative somewhat out of proportion to the type and amount of medications Petitioner was prescribed, and the frequency which she sought treament. *See* note 2, supra.

The Court finds the ALJ's reasons for discounting Petitioner's testimony about the disabling effects of her symptoms are not supported by substantial evidence in the record.

## CONCLUSION

Although Petitioner argues this matter merits an award of benefits, the Court will remand this case to the Commissioner for proper consideration of step three equivalence and analysis of Petitioner's credibility and her medical care providers' opinions to determine Petitioner's RFC at step four, because she is in a better position to evaluate the medical evidence. On remand, if the Commissioner finds Petitioner's impairment or

combination of impairments equals a listing, Petitioner is presumed to be disabled, and benefits should be awarded. If the Commissioner determines Petitioner's medical evidence is insufficient to raise a presumption of disability, she should continue the disability evaluation to steps four and five, addressing the errors the Court finds with respect to the ALJ's analysis of Petitioner's credibility and her treating physician and other treating source opinions.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2) This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3) This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

Dated: **September 29, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 28**